SO ORDERED.

SIGNED this 4th day of November, 2013.



_____
Janice Miller Karlin
United States Bankruptcy Judge
_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:
**Daniel Lee Knowles**
**Tiffany Ann Knowles,**

**Debtors.**

**Case No. 13-40602**
**Chapter 13**

_____

## Memorandum Opinion and Order Overruling in Part and Sustaining in Part the Trustee's Objection to Plan Confirmation

Debtors seek confirmation of a Chapter 13 plan[1] that treats debts owed to two unsecured creditors—a student loan creditor and the Kansas Department of Labor (KDOL)—dramatically more favorably than the debts they owe to their many other general unsecured creditors. Debtors' plan also calls for them to retain and fully pay for a third, non-exempt vehicle for their two-person household, while also paying for the two vehicles they elected to exempt. The chapter 13 trustee (the Trustee) objects to all of these proposals.

_____
[1] Doc. 2.

The Court overrules in part and sustains in part the Trustee's objection to plan confirmation. The Code, since being amended in 2005, only prohibits above-median income debtors from voluntarily paying nondischargeable student loan debt using discretionary income outside of a plan when all projected disposable income, as defined by the Code, is paid into a plan when *unfair* discrimination results from such treatment. The treatment of the student loan creditor in this case does not create unfair discrimination under 11 U.S.C. § 1322(b)(1) if Debtors are not accelerating the repayment of the student loan. Debtors' treatment of the KDOL claim, however, does unfairly discriminate against similarly situated creditors, and the Trustee's objection to this part of the plan is therefore sustained. The Trustee's objection to Debtors' planned retention of a third vehicle is also sustained, as Debtors did not carry their burden to show that this plan provision was filed in good faith under 11 U.S.C. § 1325(a)(3).

Because of these rulings, Debtors' plan cannot be confirmed. Debtors must file an amended plan consistent with this decision within 21 days of the entry of this Memorandum Opinion if they wish to remain in a Chapter 13 proceeding.

## I.  Factual and Procedural History

The parties stipulate to the following facts,[2] which are supplemented by record

---

[2]  Doc. 28 (Stipulations of Fact). On July 24, 2013, I set a deadline for the parties to stipulate to all facts they could stipulate to by August 14 (rejecting Debtors' counsel's preferred procedure that required the Trustee to file a summary judgment motion). On August 14, the Trustee filed a Motion to Extend the deadline to file stipulations (Doc. 27), noting that while the Trustee had tried, in good faith, to meet the August 14 deadline by sending proposed stipulations to Debtors' counsel 6 days earlier, and soliciting similar stipulations from him, Debtors' counsel had refused to stipulate to the Trustee's facts or to

-2

-2-

evidence. Debtors filed this Chapter 13 bankruptcy in May 2013 and scheduled a total of $65,075 in unsecured claims, $40,598 in secured clams, and $268 in priority unsecured claims. While Debtors' plan will pay no dividend to general unsecured creditors, it will pay for three vehicles, with the Trustee's discount rate of interest, as follows:

- Creditor Capital One – collateral 2010 Nissan, with debt of $11,100 and value of $11,000, proposing to pay the full debt at $208.20 a month;

- Creditor Chase Auto – collateral 2006 Ford F-150, with debt of $15,698 and value of $10,866, proposing to pay the full debt at $294.45 a month because Chase Auto is a "910" creditor; and

- Creditor HD Credit – collateral 2011 motorcycle, with debt of $13,800 and value of $11,375, proposing to pay full debt at $258.85 a month because HD Credit is a "910" creditor.

The plan also provides full payment of the anticipated $4,793 KDOL claim as a special class.[3] Debtors' schedules list student loan debt owed to Direct Loan Servicing System

offer any of his own. Counsel's main basis for refusing to stipulate, originally, was that most of the facts the Trustee sought to stipulate could be found if I simply combed through the pleadings on file for the information. I conducted a status conference on August 15, 2013, and confirmed that while Debtors' counsel still disagreed with my order to stipulate to the relevant facts (and if the parties disputed any material facts, we'd have an evidentiary hearing solely on the limited disputed facts), he did not actually dispute any of the Trustee's offered facts, and did not need any additional facts of his own. As a result, Debtors' counsel ultimately agreed to sign the Stipulation of Facts that the Trustee had originally presented to him. This is fairly summarized in an Order I signed on August 16, 2013 (Doc. 29, noting "The parties have indicated agreement to the facts circulated."). At no time since (other than to present additional evidence about retention of the third, non-exempt vehicle, as the parties agreed) have Debtors indicated a desire to present additional evidence.

[3] Although KDOL has not yet filed a claim (the government bar date doesn't expire until November 13, 2013), this opinion will refer to its "claim" as opposed to its "debt" for consistency.

Case 13-40602   Doc# 47   Filed 11/04/13   Page 3 of 28

for $33,975 and to U.S. Department of Education for $1028.[4] The plan provides to pay those student loans pro rata with other general unsecured creditors, but Debtors do not expect that any portion of the payments they promise to make to the Trustee will ever reach any unsecured creditor except for KDOL.

Debtors' plan payment is $980 per month. Debtors are above-median income and thus their applicable commitment period is 60 months.[5] Debtors' budget reflects $1051.25 in monthly net income, although Mr. Knowles admitted at trial that his Schedule J overstates his true motorcycle insurance costs by close to $100 each month.[6] Debtors' monthly expenses include, but are not limited to: $300 for transportation (not including car payments); $250 for auto insurance; $56.56 for motorcycle insurance; $75 for auto tags and taxes; and $500 for "student loan repayments to Fed Loan, UNL." Over the life of Debtors' plan, they will thus spend $18,000 for transportation (not including the note payments, which total approximately $42,000), $15,000 for auto insurance, $3393.60 for motorcycle insurance, $4500 for auto tags and taxes, and $30,000 for student loan debt repayment.

The Trustee generally objects to confirmation of Debtors' plan on the basis that

---

[4] Of these two student loan creditors, only the U.S. Department of Education has filed a claim, for $35,058.61 (Claim number 13).

[5] *See* 11 U.S.C. § 1325(b)(4) (requiring payments of projected disposable income for not less than five years if the current monthly income of the debtors is above the median family income for that state).

[6] At the time of filing, Debtors were paying $150/mo for motorcycle insurance. They have since switched insurers and now pay $56.56/month, but have not amended their Schedule J to reflect this savings.

-4-

it does not comply with 11 U.S.C. § 1322(b)(1) because the plan unfairly discriminates against classes within the plan. The Trustee then stated three bases for his objection to confirmation: (1) Debtors' direct payment of $500 per month for student loan debt results in unfair discrimination against other unsecured creditors; (2) there is no legal basis for separate classification of the KDOL claim as a special class; and (3) Debtors are unnecessarily retaining the 2011 motorcycle when they are already paying to retain two other vehicles.[7] Debtors' response, filed by their retained counsel, contains only one sentence: "COME NOW debtors and object to the motion to dismiss and show that the Trustee is dead wrong in the position he has taken and debtors will soon show same."[8]

I have fully considered the parties' briefs, the Stipulation of Facts, and the evidence received at trial on the issue of the motorcycle retention.[9] As a preliminary

---

[7] Doc. 18.

[8] Doc. 21. This response is wholly unacceptable. It does not provide the Trustee or me with a single factual or legal basis for Debtors' position, and, in fact, does all parties a disservice by delaying the proceedings. The response shows a lack of preparation and indicates that there was no inquiry into, or true analysis of, the factual and legal elements of the issues by Debtors' counsel. Furthermore, Debtors' counsel's refusal to enter into good faith stipulations of fact by the August 14 deadline, until I had to intervene and conduct a hearing, is similarly unprofessional and cannot be tolerated. Counsel for Debtors is warned to not file any similar pleadings in this Court, or to again refuse to cooperate when ordered to provide a Court with reasonable stipulated facts, without risk of a referral to the Kansas Board for Discipline of Attorneys for violations of the Kansas Rules of Professional Conduct. Counsel can (and must) be both professional and courteous while also protecting his clients' rights. *See* In the Matter of the Kansas Bar Association's Pillars of Professionalism Memorandum and Order, adopted by both the District and Bankruptcy Courts in this District on October 19, 2012.

[9] Doc. 31 (Brief in Support of the Chapter 13 Trustee's Objection to Confirmation); Doc. 32 (Debtors' Response); Doc. 33 (Chapter 13 Trustee's Reply Brief).

matter, I find this Court has jurisdiction to decide this matter,[10] as it is a core

proceeding.[11]

## II.    Analysis

Debtors, as the proponents of the plan, bear the burden of proof to show that

their plan is confirmable.[12]

### A.    Unfair Discrimination — Payment of Student Loans and the Kansas Department of Labor as Special Classes

Section 1322(b)(1) of Title 11 permits a chapter 13 plan to "designate a class or

classes of unsecured claims;" the plan, however, "may not discriminate unfairly against

any class so designated." Generally stated, § 1322(b)(1) permits the designation of

separate classes of unsecured claims and different treatment of the separate classes,

as long as the classification does not cause "unfair" discrimination.[13] The Court has

---

[10]  This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and 11 U.S.C. § 1334(a) and (b) and by operation of a Standing Order dated August 1, 1984, effective July 10, 1984, referenced in D. Kan. Rule 83.8.5, wherein the District Court for the District of Kansas referred all cases and proceedings in, under, or related to Title 11 to the Districts' bankruptcy judges.

[11]  *See* 28 U.S.C. § 157(b)(2)(A) and (L) (stating that "matters concerning the administration of the estate" and the "confirmation of plans" are core proceedings that a bankruptcy judge has jurisdiction to hear and determine).

[12]  *See Alexander v. Hardeman (In re Alexander)*, 363 B.R. 917, 921–22 (10th Cir. BAP 2007) (generally assigning burden of proof for confirmation to plan proponent).

[13]  Although not clear, Debtors may be arguing that § 1322(b)(1) does not apply to their preferred treatment of the student loan creditors via direct payment, because the plan itself does not directly classify the student loan creditor separately. I find that the direct payment to the student loan creditor outside of Debtors' plan is the equivalent of a separate classification for purposes of § 1322(b)(1). *See, e.g., In re Sharp*, 415 B.R. 803, 807 (Bankr. D. Colo. 2009) (stating that "classifications are not always explicit" and that "[c]ourts have recognized that a payment to a creditor 'outside the plan' can amount to an implicit classification, even though not specifically referenced in the plan"); *In re Renteria*, Case No.

-6-

wide discretion in determining whether proposed discrimination is unfair discrimination.[14]

The Bankruptcy Code does not define when a plan classification causes unfair discrimination, and courts have struggled to define the limits of unfair discrimination under § 1322(b)(1). The D.C. Circuit, the first Circuit to address unfair discrimination under § 1322(b)(1), simply stated:

> [A]n inquiry into fairness plainly involves more than the rationality of the debtor's classifications or some minimum amount creditors must receive. What constitutes fair discrimination will vary from case to case, and we cannot offer a generally applicable definition. The court must examine the amounts proposed for each class in light of the debtor's reasons for classification, and exercise sound discretion.[15]

Other appellate courts, however, have attempted to offer a "generally applicable definition" through the use of multi-factor tests.

For example, the First Circuit BAP, in *Bentley v. Boyajian (In re Bentley)*,[16] directed courts to look to "the principles and structure of Chapter 13 itself" for "the baseline against which to evaluate discriminatory provisions for fairness."[17]

---

11-25510 MER, 2012 WL 1439104, at *1 (Bankr. D. Colo. Apr. 26, 2012) (stating that "payment to . . . a student loan creditor, 'outside the plan,' *i.e.,* as a recurring expense not covered by the plan provisions or paid through the Chapter 13 trustee, can constitute an implicit classification").

[14] *Labib-Kiyarash v. McDonald (In re Labib-Kiyarash)*, 271 B.R. 189, 196 (9th Cir. BAP 2001).

[15] *Barnes v. Whelan (In re Barnes)*, 689 F.2d 193, 201–02 (D.C. Cir. 1982).

[16] 266 B.R. 229 (1st Cir. BAP 2001).

[17] *Id.* at 240.

Specifically, the *Bentley* court looked at (1) equality of distribution; (2) nonpriority of student loans; (3) mandatory versus optional contributions (a comparison of what the dischargeable unsecured creditors would receive in a pro rata distribution of the mandatory contribution under chapter 13); and (4) the debtor's fresh start.[18] Under this analysis:

> When a plan prescribes different treatment for two classes but, despite the differences, offers to each class benefits and burdens that are equivalent to those it would receive at the [statutory] baseline, then the discrimination is fair. On the other hand, when the discrimination alters the allocation of benefits and burdens to the detriment of one class, the discrimination is unfair and prohibited.[19]

The Seventh Circuit also appears to favor the *Bentley* approach. In *In re Crawford*,[20] the Seventh Circuit cited the *Bentley* opinion and then stated:

> [T]his is one of those areas of the law in which it is not possible to do better than to instruct the first-line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the purposes of the relevant law, which in this case is Chapter 13 of the Bankruptcy Code; and to uphold his determination unless it is unreasonable (an abuse of discretion).[21]

The Eighth Circuit and Ninth Circuit BAP use a different four-part test, referred to as the *Leser/Wolff* test,[22] to determine whether separate classification results in

---

[18]  *Id.* at 240–42.

[19]  *Id.* at 240.

[20]  324 F.3d 539 (7th Cir. 2003).

[21]  *Id.* at 542.

[22]  *Mickelson v. Leser (In re Leser)*, 939 F.2d 669 (8th Cir. 1991); *AMFAC Distribution Corp. v. Wolff (In re Wolff)*, 22 B.R. 510 (9th Cir. BAP 1982).

unfair discrimination. Under this test, the court is directed to ask: "(1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination."[23]

The Tenth Circuit has not considered this issue,[24] and bankruptcy courts in this Circuit have used both the *Bentley* test[25] and the *Leser/Wolff* test.[26] Although it seems that the *Leser/Wolff* test may be followed by a majority of courts,[27] this Court believes that the *Bentley* test more accurately reflects the statutory scheme established by

---

[23] *In re Leser*, 939 F.2d at 672; *In re Wolff*, 22 B.R. at 512. More recent cases from the Eighth and Ninth Circuit BAP applying the *Leser/Wolff* tests are *Groves v. LaBarge (In re Groves)*, 39 F.3d 212 (8th Cir. 1994); *Copeland v. Fink (In re Copeland)*, 483 B.R. 534 (8th Cir. BAP 2012); *In re Labib-Kiyarash*, 271 B.R. at 194–96.

[24] Even if the Tenth Circuit had specified the use of a particular test, the existing multi-factor tests are not without criticism. Some courts have noted that the multi-factor tests that have been developed to define unfair discrimination are not entirely satisfactory because they are essentially totality of circumstances tests, "running the risk of being depicted as an ad hoc, potentially purely subjective determination." *See, e.g.*, *In re Sharp*, 415 B.R. 803, 807–08 (Bankr. D. Colo. 2009) (discussing criticism of tests for determining unfair discrimination). And as noted by one commentator, "numerous authorities have suggested that the multi-factor tests boil down to nothing more than a test of reasonableness." Stephen L. Sepinuck, *Rethinking Unfair Discrimination in Chapter 13*, 74 Am. Bankr. L.J. 341, 360 n.113 (2000).

[25] *See, e.g.*, *In re Stull*, 489 B.R. 217, 220 (Bankr. D. Kan. 2013) (applying *Bentley* test); *In re Mason*, 300 B.R. 379, 387 (Bankr. D. Kan. 2003) (concluding that the *Bentley* test "is most loyal to the objective goals and motivations of Chapter 13 and the Bankruptcy Code").

[26] *See, e.g.*, *In re Anderson*, 173 B.R. 226, 229 (Bankr. D. Colo. 1993) (applying four-part *Leser* test); *In re Perkins*, 55 B.R. 422, 425–26 (Bankr. D. Okla. 1985) (same).

[27] *See In re Towler*, 493 B.R. 239, 244 (Bankr. D. Colo. 2013) (calling the *Leser/Wolff* test the "most prominent" of the multi-factor tests for unfair discrimination under § 1322(b)(1)).

-14-

chapter 13 and the spirit of the Code. As a result, I will use it to help determine whether Debtors' plan results in unfair discrimination.

Here, Debtors have discriminated in favor of two unsecured creditors—a student loan creditor and the KDOL. With regard to the student loan creditor, Debtors propose pro rata distribution along with other unsecured creditors (which admittedly is predicted to result in the Trustee paying zero dollars to *any* unsecured creditor), plus an additional $500 per month Debtors will pay directly to the student loan creditor out of the income not devoted to the plan payment. With regard to Creditor KDOL, Debtors propose a special class to fully pay the anticipated $4,793 claim, which arose from overpayment of unemployment compensation to one of the Debtors.

The Trustee argues that Debtors' treatment of these creditors unfairly discriminates against other unsecured creditors, because the student loan creditor would be paid almost in full and the KDOL claim would be paid in full, while the remaining unsecured creditors would receive nothing. And while the Trustee acknowledges that Debtors' student loan debt is nondischargeable, he argues that this fact, alone, is insufficient to justify separate treatment. He argues that if payments were instead shared pro rata among all unsecured creditors, the dividend to all unsecured creditors would be 51% (rather than zero, as currently proposed). Finally, the Trustee argues that pro rata payment to the student loan creditor in addition to direct payment is doubly unfair because if pro rata distribution to unsecured creditors would occur, perhaps due to non-filing of claims, earlier payment of secured claims, an inheritance, or the like, the student loan creditor would receive dual favorable

-15-

treatment.

With regard to the treatment of the student loan creditor, Debtors respond that the superior treatment of the student loan creditor is not unfair because that debt is nondischargeable. They argue that paying nearly all of the debt during the plan would enhance their ability to obtain a fresh start after they exit bankruptcy,[28] because if they are prevented from paying this debt for 60 months, they will face not only the $35,000 presently owed, but five years of additional nondischargeable interest when they finally exit bankruptcy with their discharge.

With regard to the treatment of the KDOL claim, Debtors argue that Kansas law allows the Department of Labor to reduce future unemployment payments by the amount of a past overpayment under K.S.A. § 44-719(d)(1), and that, *if* Debtors are laid off and *if* they apply for unemployment in the future, future benefits *might* be denied based on the outstanding overpayment. They further argue that *if* this happened during the life of this plan, there *might* be insufficient income to make plan payments.

Using the *Bentley* court's test, I consider the following factors to aid in the

---

[28] The plan will result in approximately 85% of the student loan being paid in five years when many student loans are paid out over a much longer period of time. If the actual promissory note(s) for these loans called for payment, for example, of only $300 per month, it might not be in good faith (or fair) to in essence pre-pay the student loan at the expense of other unsecured creditors. *See In re Freeman*, Case No. 06-10651-WHD, 2006 WL 6589023, at *2, n.1 (Bankr. N.D. Ga. Dec. 22, 2006) (curing and maintaining student loan debt does not unfairly discriminate; however, payment on an accelerated basis may constitute unfair discrimination); *see also In re Brown*, __ B.R. __, 2013 WL 4806392, at *11 (Bankr. S.D. Ga. 2013) (noting that the bankruptcy court would continue to approve plans that provide for regular monthly payments to a creditor equal to that required pre-petition under the loan documents, with the balance at the end of the five-year period to be excepted from discharge under § 1328(a)(1)). This precise objection is not before me with this plan, and no evidence was presented as to the amount of the contractually agreed payment.

determination whether Debtors' proposed treatment of these "preferred" creditors creates unfair discrimination: (1) equality of distribution; (2) nonpriority of student loans or the KDOL debt; (3) mandatory versus optional contributions (a comparison of what the unsecured creditors holding dischargeable claims would receive in a pro rata distribution of the mandatory contribution under chapter 13); and (4) the Debtors' fresh start.[29]

Regarding the equality of distribution, the *Bentley* court noted that the Code's focus is to treat all equally situated creditors equally, unless specifically stated otherwise in the Bankruptcy Code. Debtors do not claim that the Code has accorded either "preferred" unsecured creditor priority status under 11 U.S.C. § 507(a).[30] As a result, these "preferred" unsecured creditors would normally share in pro rata distributions with the other approximately $25,000 in unsecured claims, receiving 51% of their claims instead of 85-100%.[31] Debtors must thus justify this widely differing treatment using some alternate argument.[32]

Admittedly, student loan debts are nondischargeable, but, as stated in *Bentley*,

---

[29] *In re Bentley*, 266 B.R. at 240–42.

[30] I note that while the plan expressly states they have no priority creditors, Debtors have since stipulated that their schedules showed $268 in priority claims. I can also take judicial notice that the IRS has filed a priority claim for $1,383, and that Debtors have not objected to that claim.

[31] Doc. 28, Stipulation No. 11.

[32] *See Bentley*, 266 B.R. at 240 ("As a general rule, then, fairness in Chapter 13 requires equality of distribution among nonpriority unsecured creditors, and the burden on justification is on those who propose plans to the contrary.").

-17-

"nondischargeability is not, and does not entail, priority as to any distribution in or through bankruptcy; it merely permits the holder to continue to enforce the debt after bankruptcy. . . . Accordingly, as far as the Code is concerned, nothing in the nature of the claims at issue here warrants or justifies treating the student loans more favorably than the others."[33] Chapter 13 expressly excepts many debts from discharge, and thus the Code does not necessarily contemplate that a debtor will emerge from Chapter 13 entirely free of all prepetition debt. The "choice here is not between a fresh start and no fresh start, but between fresh starts of different extent."[34]

That said, however, I agree with one commentator who has opined that the real reason educational loans are nondischargeable has little to do with the debtor at all; they are more likely nondischargeable because Congress wishes to protect the government's fiscal health as a guarantor (or lender) of these loans, and because "if these debts were dischargeable, the availability of educational loans might drastically decline."[35] So we cannot forget that Congress, while not according student loans priority status, most certainly gave them favored status.[36] This is important when

---

[33] *Id.* at 241; *see also Towler*, 493 B.R. at 246 n.5 (collecting cases stating that nondischargeability of debt is not a sufficient basis, by itself, to justify more favorable treatment of the debt).

[34] *Bentley*, 266 B.R. at 242 n.25.

[35] Sepinuck, *supra* note 24, at 382.

[36] *Id.* at 383. The Sepinuck article also makes the interesting point that Congress may have elected to not grant priority status to student loans since the Code requires priority claims to be paid in full during a three to five year plan, which many debtors could not afford to do. Priority treatment would actually foreclose many debtors from seeking Chapter 13 relief. *Id.* at 385–86.

-18-

trying to construe how Congress wished its "fair discrimination" language to be interpreted.

I also acknowledge that the nondischargeability rule effectively forbids student loan claimants from pursuing collection from a debtor's post discharge earnings for upwards of 5 years. As a result, if the nondiscrimination rule does not allow favorable treatment of student loan claims during the life of the plan, those claimants may, in fact, be worse off than if the debtor had liquidated under Chapter 7, since they may not pursue collection for a long time. And the result for debtors is even worse—owing more on their student loans after completion of their plan than before filing for Chapter 13 relief because of accumulation of equally nondischargeable interest that will accrue.[37] Further, since it is clear that Congress intended for the means test to result in more debtors filing chapter 13 petitions rather than chapter 7 petitions, a decision that encourages a Chapter 7 filing (an outcome that could occur by denying Debtors the opportunity to maintain their student loan payment during the life of their mandatory 5-year plan) does not further the purposes or spirit of the Code.

Regarding distributions, Debtors show a negative projected disposable income on their B22C means test, so there is no projected disposable income to devote to

---

[37] *Id.* at 387-88; *In re Delbecq*, 368 B.R. 754, 759 (Bankr. S.D. Ind. 2007) (concluding that paying credit card debt instead of making student loan payments was not a reasonable alternative for a debtor as she would end up owing substantially more in nondischargeable student loans than she did upon the date of filing).

payment of unsecured creditors.[38] It is only Debtors' excess discretionary income that is devoted to the extra $500 per month payment of student loans. As a result, this prong of the *Bentley* test—the comparison of what the unsecured creditors would receive in a pro rata distribution of the mandatory contribution—is satisfied: *Bentley* notes that, "after student loan claims have shared on a *pro rata* basis with other general unsecured claims in the distribution funded by the Chapter 13 plan," the student loans may be "paid by debtors out of assets that they need not contribute to the plan."[39] This is exactly what Debtors have proposed here—it is Debtors' discretionary income, above their Code-computed projected disposable income, that they are voluntarily contributing to payment of student loans.[40] As Judge Nugent noted in *In*

---

[38] Obviously, because below I herein deny confirmation of a plan that retains a third vehicle (as discussed below), the means test would now show at least an additional $229.52 (the amount deducted for the motorcycle), thus showing a positive $198 as monthly disposable income potentially payable to unsecured creditors. As Debtors admit in their brief, the Supreme Court's recent decision in *Ransom v. FIA Card Servs., N.A.*, __ U.S. __, 131 S. Ct. 716, 722 (2011) would not allow them to deduct the costs of the associated loan for a vehicle they cannot keep. Because this would be known with certainty at the time of plan confirmation, this decision is without prejudice to any objection the Trustee or other parties in interest might make if Debtors opt to amend their plan in lieu of dismissal.

[39] *Bentley*, 266 B.R. at 243.

[40] For the plan at issue here, the Trustee did not dispute Debtors' calculation of projected disposable income. For this reason, the Trustee's argument based on *Hamilton v. Lanning (In re Lanning)*, 560 U.S. 505, 130 S. Ct. 2464 (2010), is misplaced. The Supreme Court in *Lanning* held that "when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Id.* at 2478. The Trustee cites this case and then argues that the Supreme Court requires chapter 13 debtors to satisfy a forward-looking approach to income (rather than a mechanical approach), and that this somehow requires debtors to make equal payments to all similarly situated creditors. But the *Lanning* opinion does not reach this far—in fact, although the opinion gives lower courts permission to consider changes in income or expenses when computing projected disposable income, it says nothing about the treatment of discretionary income above that

-20-

*re Stull*, after assessment of the *Bentley* test in that case: "Because student loans are not accorded statutory priority, anything they receive over what they would take in a pro rata distribution without the discrimination, should come from assets not required to be contributed to the plan and thus not detract from the unsecured creditors' take."[41]

Application of this factor to the KDOL claim, however, is less clear. As a result of Debtors' special treatment of this claim, other unsecured creditors essentially bear the burden of paying this similarly situated dischargeable debt, although the difference in pro rata distribution would be admittedly small. And while Debtors argue that they must separately classify this debt because they may need unemployment compensation in the future, and they presume that if they do not repay this claim in full they may be denied future benefits, there are no facts in evidence to support this argument. There is nothing in the Stipulation of Facts that provides evidence about the likelihood either Debtor might be laid off during the life of the plan, or, if they were, whether they could defer payment of other expenses until re-employment without the need for unemployment benefits. In addition, Debtors fail to acknowledge that the very statute upon which they rely for this argument—K.S.A. § 44-719(d)(1)—also allows the secretary of the agency to totally waive repayment under certain conditions, making the certainty they would face consequences for nonpayment even more speculative. Debtors are now currently gainfully employed, qualifying as above-median income

---

number, and certainly does not define unfair discrimination under § 1322(b)(1).

[41] 489 B.R. 217, 220 (Bankr. D. Kan. 2013).

debtors. Accordingly, any potential future impact on Debtors' fresh start is pure speculation. For that reason, I have no evidence upon which I can find this discrimination is "fair."[42]

Finally, under the *Bentley* test, I consider Debtors' fresh start. Admittedly, as the *Bentley* court notes, "affording debtors a fresh start is one of the fundamental purposes of Chapter 13 and of the Bankruptcy Code in general."[43] But the Code places many limitations on this fresh start, including its express exclusion of most student loans from discharge under § 523(a)(8). And fair distribution to creditors is equally an important goal of the Code as is a fresh start. The Code contemplates that student loans will remain after debtors receive their discharge. Debtors will presumably be better situated to repay those student loans, having received a discharge of all their other unsecured debt. Yet, as *Bentley* notes, nothing in the Code prevents debtors from facing this debt earlier, using their discretionary income to pay student loan debt throughout the life of the plan.

Based on the consideration of the *Bentley* factors, and a weighing of the burdens and benefits established by the Code as a baseline, this Court concludes that the direct payment to the student loan creditor of ongoing contractual payments does not constitute unfair discrimination under § 1322(b)(1). Although student loans are not

---

[42] Unlike the student loan claim, where the Trustee has admitted its nondischargeability, there is no similar admission regarding the KDOL debt, and Debtors have not claimed the KDOL debt is nondischargeable.

[43] 266 B.R. at 242.

-22-

accorded priority by the Code, Debtors are contributing this excess amount to the student loan debt only from funds not required by the Code to be committed to the plan. As stated by *Bentley*, "[w]hen a plan prescribes different treatment for two classes but, despite the differences, offers to each class benefits and burdens that are equivalent to those it would receive at the baseline, then the discrimination is fair."[44] If payment of $500 per month to student loan creditors is what is required by Debtors' contract, then the treatment of the student loan creditors in this case is no different than that contemplated by the Code, and Debtors do not unfairly discriminate by devoting their discretionary income to repayment of those loans.

For these reasons, the facts of this case are distinguishable from the case upon which the Trustee relies, *In re Kubeczko*.[45] The bankruptcy court in *Kubeczko* analyzed whether a below-median income debtor could pay monthly payments to student loan creditors as a long-term debt under § 1322(b)(5), thereby causing a significant decrease in plan payments to other unsecured creditors.[46] The *Kubeczko* court concluded that the proposed treatment resulted in unfair discrimination under § 1322(b)(1).[47] But the difference from the facts at hand is critical. The debtor in *Kubeczko* earned below median income and thus, pursuant to the Bankruptcy Code, had no disposable income. Here, Debtors are above-median, and propose to commit their *discretionary* income to

---

[44] *Id.* at 240.

[45] Case No. 12-13766 HRT, 2012 WL 2685115 (Bankr. D. Colo. July 6, 2012).

[46] *Id.* at *1–2.

[47] *Id.* at *5.

Case 13-40602    Doc# 47    Filed 11/04/13    Page 18 of 28

their student loan payments. Utilizing the baseline test, this is permissible, because the "principles and structure of chapter 13 itself" do not indicate the procedure is unfair.[48]

For similar reasons, the Court rejects the Trustee's argument that payment to the student loan creditor via both direct payment and pro rata through the plan is unfair. The Trustee contends that if pro rata distribution to unsecured creditors occurs under the plan, the student loan creditor will receive dual favorable treatment. But grouping of unsecured creditors for equal plan payment is exactly what the Code contemplates, and I cannot determine that equal distribution of any plan payments, as directly required by the Code, is unfair discrimination.[49] In this case,

"Debtors' student loan and non-student loan creditors are receiving

---

[48] *Bentley*, 266 B.R. at 240. The Trustee argues that it is absurd for Congress to permit a more wealthy, above-median debtor to pay a student loan through the plan but then deny the same benefit to a below-median debtor. While I express no opinion on how this case would be decided if Debtors were below-median, I do note that the entire exercise of determining *unfair* discrimination (which is not permitted) versus discrimination (which is permitted) necessarily requires a weighing of factors. And although from where I sit the result of permitting wealthier debtors (who will presumably have more income after bankruptcy) to pay student loans during bankruptcy but to deny that same benefit to poorer debtors may not seem well-guided, Congress did not ask for my advice when it wrote the current version of the Code, and that current version appears to require this result. So while the result may be misguided, I cannot find the result is necessarily absurd. First, this interpretation does still allow some (wealthier) debtors a "fresher" start, a fresh start being a stated goal of the Code. Second, an interpretation that repays government-backed debt more quickly also furthers the government's interest in replenishing the Treasury and potentially having more funds available to make more student loans.

[49] *See, e.g., In re Sharp*, 415 B.R. 803, 813 (Bankr. D. Colo. 2009) (citing *Bentley* and concluding that the debtors' pro rata payment to student loan creditors in addition to a monthly discretionary payment to student loan creditors was not unfair discrimination because equal distribution of plan payments, by definition, did not discriminate). I also note that no party expects this double recovery to actual occur, because the plan anticipates no payments to the student loan creditors under the plan.

-24-

exactly what the Code requires Debtors to pay them—a pro rata payment of PDI [projected disposable income]. The fact that the student loan creditors are also receiving a discretionary payment from Debtors does not entitle the remaining unsecured creditors to additional moneys, nor 'dis-entitle' student loan creditors from receiving a pro rata payment."[50]

The Court finds that the treatment of the debt owed KDOL as a special class, however, is unfairly discriminatory. Debtors do not assert that the KDOL debt commands either priority status or that it is a nondischargeable debt. As a result, and in contrast to the analysis of the student loan debt, the proposed treatment of the KDOL debt does unfairly discriminate against similarly situated creditors. Debtors presented no evidence whatsoever on this issue, and thus failed to demonstrate it was more likely than not that failure to pay 100% of that debt would impair their fresh start. Accordingly, the Court finds that the proposed discrimination merely "alters the allocation of benefits and burdens to the detriment of one class,"[51] and the discrimination is, therefore, unfair under § 1322(b)(1).

### B.    Good Faith — Retention of Third Vehicle

The Trustee also challenges Debtors' plan to retain and pay for three vehicles through their plan. Debtors propose to retain and pay for a 2010 Nissan Sentra, a 2006 Ford F-150 pickup, and a 2011 Harley Davidson motorcycle. Debtors claimed the Nissan and Ford as exempt, and do not dispute that the Harley motorcycle is not exempt. Debtors' plan will also pay more for both the Ford and the Harley motorcycle

---

[50]  *Id.*

[51]  *Bentley*, 266 B.R. at 240.

than they are worth, because they were both purchased within 910 days of filing bankruptcy.[52]

Section 1325(a)(3) requires that a chapter 13 plan be "proposed in good faith and not by any means forbidden by law." Whether a plan has been proposed in good faith is a question of fact based on the totality of the circumstances.[53] In *Flygare v. Boulden*,[54] the Tenth Circuit expressed the following non-exclusive factors for determining a debtor's good faith:

> (1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee.[55]

The continued viability of the *Flygare* factors for all cases, however, has been questioned by a subsequent Tenth Circuit case as a result of the 2005 amendments to

---

[52] *See* Doc. 28, Stipulation No. 2 and 11 U.S.C. § 1325(a) (requiring full payment of vehicles purchased within 910 days of bankruptcy, with interest, in chapter 13 plans).

[53] *Robinson v. Tenantry (In re Robinson)*, 87 F.2d 665, 668 (10th Cir. 1993).

[54] 709 F.2d 1344 (10th Cir. 1993).

[55] *Id.* at 1347–48 (quoting *United States v. Estus (In re Estus)*, 695 F.2d 311, 316–17 (8th Cir. 1982)).

-26-

the Bankruptcy Code.

In *Anderson v. Cranmer (In re Cranmer)*,[56] the Tenth Circuit noted that the Bankruptcy Code has been amended since *Flygare* was decided to include § 1325(b), and that "[s]ection 1325(b)'s 'ability to pay' criteria subsumes most" of the *Flygare* factors such that the "good faith inquiry now has a more narrow focus."[57] Regardless, the Tenth Circuit stated in *Cranmer* that bankruptcy courts still need to consider "factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code."[58]

The Trustee argues that Debtors' retention of a third vehicle is unreasonable and unnecessary. He notes that by claiming two other functioning vehicles as exempt, Debtors have essentially admitted that it is the Nissan and Ford that they regularly use for transportation to and from work.[59] The Trustee contends, then, that retaining and paying for a third vehicle (the motorcycle) for a two-adult household must necessarily be a luxury expense, and that diverting income from unsecured creditors so they can retain a spare vehicle would create an absurd result. The Trustee argues that retention of the motorcycle, along with associated increased insurance, tax, and

---

[56] 697 F.3d 1314 (10th Cir. 2012).

[57] *Id.* at 1319 n.5 (internal quotations omitted).

[58] *Id.* (internal quotations omitted).

[59] *See* K.S.A. §60-2304(c) (granting exemption for "one means of conveyance regularly used for the transportation of the person or for transportation to and from the person's regular place of work").

-27-

maintenance costs, when Debtors propose no dividend to unsecured creditors, would hinder the spirit and purpose of the Code.

Debtors respond that retaining the motorcycle is not only necessary—because Mr. Knowles rides the motorcycle to work in warm weather—but financially wise, because if required to surrender the motorcycle, Debtors' transportation expenses would actually *increase* due to higher costs associated with the Ford's poor gas mileage. Debtors presented evidence that Mr. Knowles rides the Harley motorcycle to work about 32 weeks a year, from mid-March to late-September or October. Debtors live about 18 miles from Mr. Knowles' job, and Mr. Knowles testified that he could make two weeks' worth of trips to work on one tank of gas in the motorcycle, but it cost an additional $60 a week for gas when he drives the truck to work. Mr. Knowles ultimately claimed that riding the motorcycle saves him about $1920 a year in gas.[60]

In reaching that conclusion, however, Mr. Knowles failed to consider the other costs associated with retaining this spare vehicle. Mr. Knowles testified that the motorcycle's tags and taxes cost about $200 a year, insurance (at $56.56 per month) $678.72 a year, and the annual note payment totaled $3096 (at $258 each month). The actual comparison is, therefore, a questionable $1920 per year gas savings versus a certain $3,974.72 per year expense of ownership of the motorcycle. And this does not

---

[60]   This claimed savings did not compute. Mr. Knowles testified he rode the motorcycle to work approximately 32 weeks a year, and that round trip mileage was 180 per week. So over a year, to reach the claimed savings, he would need to drive the cycle to work 5,760 miles. He testified, however, that he purchased the cycle with 3,000 miles 13 months ago, and that it now has 6,000 miles. It is thus clear that he is not driving the cycle nearly as much as his "savings" claim, further buttressing my conclusion that not only is this a luxury item, but that the claimed gas savings are not as significant as claimed.

account for any additional maintenance costs (or new tires) that Debtors would likely encounter over a 60 month plan, so the difference is probably even greater.

Debtors' brief additionally contends that, regardless of whether retention of the motorcycle is necessary for their maintenance and support, as long as they comply with the Code's provisions for retention of secured debt, they have filed their plan in good faith, citing Judge Berger's decision in *In re Roberts*[61] and contrasting it to Judge Nugent's decision in *In re Sandberg*.[62] In *Sandberg*, the above-median debtors proposed a chapter 13 plan that paid unsecured creditors only a 2.3 per cent dividend, but proposed to retain and pay for a 36-foot boat.[63] Judge Nugent concluded that the boat was indisputably a luxury item, and that the debtors' motivation and sincerity with respect to rehabilitation through their chapter 13 plan weighed in favor of a finding that the plan was *not* proposed in good faith.[64] Judge Nugent concluded that it was fundamentally inappropriate to "discharge so much unsecured debt while still retaining and enjoying a luxury item" and that "[h]olding otherwise would defy the letter and spirit of chapter 13."[65]

In *Roberts*, the above-median debtors proposed a chapter 13 plan that retained their expensive home (valued somewhere between $530,000 and $665,000) while

---

[61] 493 B.R. 584 (Bankr. D. Kan. 2013).

[62] 433 B.R. 837 (Bankr. D. Kan. 2010).

[63] *Id.* at 839–41.

[64] *Id.* at 844–45.

[65] *Id.* at 848.

Case 13-40602   Doc# 47   Filed 11/04/13   Page 24 of 28

paying nothing to general unsecured creditors.[66] In analyzing whether the debtors' plan was proposed in good faith, and citing the good faith factors cited by the Tenth Circuit in *Cranmer*, Judge Berger specifically found that the debtors' documents and schedules were accurate, and that there were no attempts to mislead the bankruptcy court.[67] More importantly, Judge Berger then noted:

> Here, the Debtors have attempted to follow the Bankruptcy Code; they have *pared their expenses and share a single car*, they have amended their schedules to more accurately reflect their financial situation, and they ask to keep their house *in which they have lived for eight years.*[68]

As a result of these findings of fact, Judge Berger found no unfair manipulation of the Bankruptcy Code, and concluded that the totality of the circumstances indicated that the debtors filed their chapter 13 plan in good faith in accordance with § 1325(a)(3).[69]

In contrast, Mr. Knowles testified that his wife drives the Nissan to work, and that their work shifts do not allow them to ride together. He also testified, however, that he makes no attempt to utilize the far more fuel efficient/30 mpg Nissan for his work transportation on days Ms. Knowles does not work (which, most weeks, is four days, as she is a registered nurse most often working three 12-hour shifts). The facts also showed that both the Ford F150 and the Harley motorcycle were purchased within about 15 months of filing bankruptcy—the Ford F150 was purchased in February 2012,

---

[66] 493 B.R at 587.

[67] *Id.* at 594–95.

[68] *Id.* at 596 (emphasis added).

[69] *Id.*

the Harley motorcycle was purchased in August 2012, and Debtors filed their bankruptcy petition in May 2013. Further, the debt on the Harley—which Debtors propose to pay in full through the plan—is $14,272.59, but the motorcycle is worth only $11,375.

As a result of this evidence, I find the totality of the facts in this case are much more similar to those in *Sandberg* than to the facts in *Roberts*. First, by exempting the Nissan and the Ford F150, Debtors necessarily claim those were the two vehicles necessary for their transportation to work. For them to now fudge on which vehicle they actually use most places Mr. Knowles' testimony in conflict with their sworn schedules. Second, state law allows the exemption of one vehicle, not 1.5 each as they essentially want. Third, the Harley motorcycle is indisputably a luxury item. While they may save some money on gas when Mr. Knowles elects to ride it to work, they spend far more than they save when considering the overall costs of insurance, tags and taxes, maintenance and debt payments. Fourth, Debtors admit that they seek to retain this motorcycle even though retention will require them to pay $3000 more than it is worth; this makes no financial sense. Fifth, unlike in *Roberts* where the debtors hoped to retain their one exempt homestead allowed under Kansas law, instead of two, these Debtors think they should be able to retain more than state law exemptions allow. Finally, the debtors in *Roberts* had pared expenses, contrary to the evidence here, where in spite of having incurred upwards of $65,000 in unsecured debt, Debtors purchased not one, but two, vehicles within 15 months of bankruptcy (and the motorcycle less than 9 months before filing). There is simply no financially responsible

-31-

reason to retain an expensive Harley motorcycle under these facts other than simply because Debtors like to have it—and this is not enough, especially where Debtors propose *zero* dividend to their non-preferred unsecured creditors.

As stated by Judge Nugent in *Sandberg*, a "primary purpose of the good faith inquiry is to determine under the totality of the circumstances of a case whether there has been an abuse of the provisions, purpose, or spirit of Chapter 13."[70] The Court finds here that permitting Debtors to retain and pay for their third vehicle, a Harley Davidson motorcycle, at the expense of any dividend to their unsecured creditors, is not in good faith, but would instead be an unfair manipulation of the Bankruptcy Code. Debtors have failed to carry their burden under § 1325(a)(3). Like Judge Nugent did in *Sandberg*, I question these Debtors' motivation and sincerity with respect to rehabilitation through their chapter 13 plan, and find the plan was *not* proposed in good faith.[71]

## III.   Conclusion

The Trustee's objection to confirmation is overruled in part and sustained in part, as indicated more fully herein. Because of these rulings, Debtors' plan, as proposed, cannot be confirmed. Debtors must file an amended plan, tailored to reflect the rulings contained herein, within 21 days of the entry of this Memorandum Opinion, if they wish to remain in this Chapter 13 proceeding. Failure to do so will result in the

---

[70]   433 B.R. at 845.

[71]   *Id.* at 844–45.

-32-

dismissal of their case for undue delay prejudicial to creditors pursuant to 11 U.S.C. 1307(c)(1).

**It is so ordered.**

###